Good afternoon. We are here to hear oral argument in King v. Warden. Counsel, we're familiar with your cases. We've read your briefs. The authorities cited in your briefs. We've looked at least portions of the record. You have limited time available, so feel free to get to the heart of your argument. You're not going to waive anything by not arguing it. Give us what you think we really need to know that will help us resolve your appeal. If you're answering a question from the court when the red light shines, you can, of course, finish your answer. But please be mindful of our time and that the red light means that it's time to wrap it up. And if you're answering a question from the court, you won't lose any rebuttal time if that's something you have. We'll begin by hearing from Ms. Arsenault. Ms. Arsenault, do you have any Louisiana ties? I am from Louisiana, yes. Cajun country. I've spent several great years in the great state. Wonderful. Well, may it please the court, Anna Arsenault on behalf of Petitioner Warren King. Prosecutor John Johnson purged black people from Warren King's jury, striking seven of the eight qualified black jurors from the panel. When the trial court agreed with defense counsel that there was a prima facie case of discrimination, the trial court instructed Mr. Johnson to disclose the reasons for his strikes, and Mr. Johnson railed against Batson and the scrutiny that the trial court and the Georgia Supreme Court would provide over his strikes. Explaining why he struck the first black person from the panel, Johnson said the main reason that he struck Jacqueline Alderman was because she was a black female from certainty. He also claimed that he struck... Alderman was seen, right? Alderman was reinstated after the trial court found a Batson violation with respect to her. Johnson did not make that mistake again in explaining his subsequent strikes of black people. The Georgia Supreme Court said nothing about Mr. Johnson's railing against Batson and seating Miss... What's her name, Anderson? Alderman. Miss Alderman. The Georgia Supreme Court said nothing about the prosecutor's reaction, and that was specifically presented to it in Mr. King's appellate briefing. Mr. King's appellate counsel asked the court to consider Johnson's reaction, not only to the demand by the trial court that he put his reasons for his strikes on the record, as Batson requires at the second step, but also once the trial court reinstated Miss Alderman on the jury, he threw such a fit. He became so outraged that the trial court had to tell him to get a moment to get your thoughts together. You need to calm down. This was not considered at all by the Georgia Supreme Court, and that is one of many critical omissions that the court did not discuss in its Batson analysis. Well, it was for a juror who was seated. Is it all that surprising that the Georgia Supreme Court didn't address it, since, of course, that wouldn't have been really the main subject of the appeal since that juror was actually seated? Well, Your Honor, I think it's interesting and important to note how the court did note what happened with Miss Alderman, and specifically the trial court found that the prosecution's evidence was insufficient to rebut the showing that the defense counsel had made of a race-based strike. But in fact, at Batson Stage 3, what the court is finding is that the prosecutor has engaged in purposeful discrimination, and that is absolutely a factor that the court should be considering in determining whether, under all the relevant circumstances, the remaining strikes of black people, again, at a very stark rate, was pretextual. But the relevant consideration is not the fact that Miss Alderman was seated, but the prosecutor's demeanor is a relevant factor that the court's incentive that we ought to take into consideration in determining whether or not there is a Batson violation, and the Georgia Supreme Court failed to take into consideration the prosecutor's demeanor, period, right? That's correct, Your Honor. That's one of several things that the Georgia Supreme Court failed to consider in its Batson analysis, and again, one thing that the court was specifically asked to consider in Mr. King's appellate briefing. Do our precedents say that the fact that the court doesn't mention it in its written opinion, are we to assume that that means the court didn't consider it? Well, I think, Your Honor, no, the answer is no, but I think that the phrasing of the court's discussion of a brief mention of the strike of Miss Alderman is important, and I think there are many other factors, too, that the court did not consider that I think demonstrate the unreasonableness of the opinion at Batson Stage 3. I thought what the prosecutor said in reaction to the Alderman ruling was offensive, okay? But this is the way I understood it. I want to make sure we're reading it the same way. So what he said was, the way I read this, I'll read what he said, and that's the problem I have with all of this, that it's not racially neutral. There was a time when it was racially neutral, and that was before Batson, because I had to act that way when I was in Brunswick, because it was a physical impossibility if you wanted to strike every black off a jury for you to do that, and we had an issue just, you had to reform your whole idea, and then Batson came out, and Batson now makes us look at whether people are black or not. I'm sorry, I'm very angry right now. It's not, I mean, it's a rant about the decision of the Supreme Court that binds the courts and that they're obliged to consider, and to me is offensive and distracting, but the problem he expresses is one where what he said he was doing before was not concentrating on race, and now he has to think about race as a result of Batson, and I don't take that as all that informative of the other strikes that the Georgia Supreme Court had to deal with. Am I wrong about that? Well, Your Honor, I'm not going to pretend that I can make sense of Mr. Johnson's rant. As you described it, I think that some of it is nonsensical, and he was clearly very angry, and again, the court had to instruct him to collect his thoughts and calm down because he was throwing a fit. I think it's the reaction itself that's critical, and I do think that his language about the physical impossibility of striking every black person if he wanted to is also telling. Now, even before the trial court's ruling, just when the trial court demanded he give his reasons under Step 2 of the Batson analysis, his reaction there is also very telling because he is saying that the Georgia Supreme Court, the trial court, have no business with telling him how he conducts the strikes, and at that point, Batson was very established law, and so I do think that his reaction, both at that initial Step 2 and with respect to the... It's just unclear to me, given that context and the way I understand those remarks, how informative it is necessarily of the other strikes, the ones that are actually raised on appeal that the Georgia Supreme Court has to deal with, and it's not surprising to me that the Georgia Supreme Court, in writing an opinion about the strikes that are actually before it, does not feel obliged to say anything really about this. Well, Your Honor, again, I don't want to dwell on it for too long, but his initial reaction was not just respect to Ms. Alderman, it was respect to the trial court's demand that he provide race-neutral reasons altogether, and again, this was specifically something that Mr. King's appellate counsel asked the Georgia Supreme Court to consider. You may not want to dwell on this for too long, because I know you've got some other relevant considerations as well, but is this the same juror where the prosecutor said Ms. Stark-Ellinger, she was a black woman? Yes, Your Honor, exactly. So we have an explicitly racist reason on the record, which is a very unique thing to have in these cases, as this court knows. Yes, he initially says my main reason is because she is a black female from certainty, and then he gives another reason, which the trial court found was refuted by the record, specifically that Ms. Alderman said she knew Mr. King, and she specifically said she did not. But there are other very critical omissions that the Georgia Supreme Court failed to consider under its required Batson analysis of all the relevant circumstances, and I think one of the most stark... Which jurors do you think you have the best case on? Because we've got McTeer. It looks to me like there was a failure to exhaust past McTeer. That's not one of your better ones. We have McCall, Burkett, Gillis, Ford, and then Bannon-Dean. So if you were to direct us the ones that you think are the most productive, what would you say? Yes, Your Honor. I would point the court's attention first to Lily Burkett. Prosecutor Johnson claimed that he struck Ms. Burkett because she was... He gave two reasons. One, because she was a minister, and secondly, because she had familiarity with the family. And I'll talk first about the minister comment first. So there was another minister in the venari. Correct. It was number 41 of 42, and the district court said not one, therefore, that could have been reached by the prosecutor. And it did seem to me, given that context, that when the Georgia Supreme Court describes that juror as not... Well, says that the only minister who was a prospective juror was Burkett and was struck, that if we were giving the benefit of the doubt to the decision of the Georgia Supreme Court, the fact that this other juror who was a minister was not struck, it would be fair to say that juror was not really a prospective juror, given that juror's placement in the venari, number 41 of 42. Well, Your Honor, I think that may be reading too much into the Georgia Supreme Court's very clear language that says that none of the prospective jurors in the panel were ministers besides Ms. Burkett. And as far as whether the state didn't... None of the prospective jurors that the prosecution would have had a reasonable chance of striking? Well, Your Honor, I... I think you inferred something about someone who wasn't going to be reached. Well, the only reason that Mr. Lightsey wasn't reached is because the defense hadn't exhausted its peremptory strikes. Mr. Johnson was well out of peremptory strikes by the time Mr. Lightsey would have come up. And in the Supreme Court's decision in Foster v. Chapman, another Georgia case, where the voir dire and the striking process was similar, well, it was identical, the court said that the prosecutor has to make up his mind ahead of time and has to know very well what strikes he intends to make. You only have 10. But I also want to... I don't understand that answer. And maybe you can help me understand how the striking works. But it would seem to me if it's number 41 or 42, the prosecution only has 10 strikes, the likelihood of being able to strike that juror is remote for the prosecutor. Well, that may be true, Your Honor, but it certainly reflects a prioritization. If you are really unhappy with juror number 42, then you may very well want to save that strike because... If she don't have objections to other jurors... Sure. Right. But if you're choosing... Or that she would not strike that juror if he got to that juror. Yes, Your Honor. But given the record we have, there was no chance of that, was there? Well, I wouldn't say that there was no chance of it at all, Your Honor. Again, the only reason, there are 42 jurors from which the parties were striking from. The defense had, this will challenge my math, but the defense had 20 and the prosecutor had 10. And if both sides used all of their peremptories, then you're left with 12. And so the prosecutor does need to make that determination from the outset, who are the top 10 people that I want removed from this jury. I also want to direct this court's attention to Mr. Lightsey's voir dire specifically, in which Prosecutor Johnson does not ask him a single question about his leadership role in the church. He asked him one question only, which was, do you have an opinion about the way this case ought to go? And Mr. Lightsey said no. This is a stark contrast to how Mr. Johnson questioned Juror Burkett and other jurors. If he was so concerned about their role in the church, then why is he not asking Thomas Lightsey about his role in the church? And Mr. Lightsey revealed, under defense questioning, that he was a minister in his church. I'd also like to point out that, with respect to the minister reason offered by Mr. Johnson, that there were many other people on the jury who had leadership roles in their church, including foreperson Aubrey Lynch, who was a deacon in his church, and Juror James Orvin, who was also a deacon and held a position on his deacon's board. Mr. Johnson didn't inquire of any of these. Why would he not consider a deacon to be a minister? I understand that, Your Honor, but it certainly, if this was an area of such concern to Mr. Johnson, it certainly raises an inference of discrimination in light of the rest of the record, that he's not asking about the roles and responsibilities of these leadership positions. Do you have to show how many of these people had leadership positions of some sort in their church? Do we have to show that? No, you don't have to show that. Yes. In total, from the entire panel, I don't. But it is briefed in our pleadings before the court, the number of... from Sunday school teachers to ministers. Doesn't that turn out to cut both ways? If many members had some sort of position of leadership in their church, wouldn't that mean that that would have to be the only thing you considered if you were going to use all of your peremptories on anyone who had a leadership position in the church? Well, I think that may be true if that weren't the reason that Prosecutor Johnson gave specifically for striking Ms. Burkett. If he had serious concerns about the leadership roles and what that meant for those jurors and their views on the death penalty or anything else, then that was something that he could have inquired more of and he did not. And that is something that the U.S. Supreme Court makes very clear that courts must consider in analyzing the Batson analysis. And with respect to Juror Burkett, the second reason offered by Prosecutor Johnson that Ms. Burkett had familiarity with her family, even the Georgia Supreme Court recognized that that was not a unique quality to this juror and Ms. Burkett, in fact, knew both Mr. King and Ms. Crosby's families as her younger siblings had gone to school with Karen Crosby, the victim. And she made clear that she didn't personally know Mr. King. So again, this reason cannot stand up to scrutiny. And just one further point on Ms. Burkett with respect to the minister and the Georgia Supreme Court's opinion. Ms. Burkett did know the family, right? She said she did know the family, yes, Your Honor. As did other jurors, including Ms. Alderman, who the court found. Their knowledge, though, from just what's in the record, it would appear it would be not as intimate, given proximity alone, right? Well, Your Honor, that depends. There was Juror Rebecca Griffin, a white woman, who knew King's sister and her brother had gone to school with Mr. King himself. And so we don't know more about her familiarity. She might go to school with a lot of people from a community. But if you're talking about a neighbor in the neighborhood, right, with members of the family, the proximity is different, isn't it? Well, it depends, Your Honor. I certainly know classmates much better than a lot of my neighbors. And the point is that Mr. Johnson was not inquiring about these issues. He was not probing these jurors about their familiarity with Mr. King based on the neighborhood or based on their dealings in school. And I think that's really critical here under this court's analysis. Another juror I would direct the court's attention to is Sarah McCall, who did express some hesitation about the death penalty in her voir dire with the court. But critically, she said she made very clear to the court that I really do believe in some cases the death penalty should be given. And Prosecutor Johnson said that he was on the fence about Ms. McCall until her husband, who was also on the panel, was questioned during voir dire. And her husband, according to Johnson, said that she was opposed to the death penalty. But her husband never said that. And the Georgia Supreme Court characterizes this as a mere mistake. But I would urge this court, based on Supreme Court precedent and Johnson's series of mistakes in this case, that that should not be excused as a mistake and in fact as evidence of pretext. I can turn briefly to the ineffectiveness claim for a run out of time. Mr. King's jury never heard the most critical evidence in mitigation that Mr. King was exhibiting psychotic symptoms prior to this crime and during his pre-trial incarceration. Evidence of mental illness that this court has repeatedly found to have high mitigating value. Family members and acquaintances testified at habeas proceedings that Mr. King would walk around talking to himself. He would laugh at inappropriate times. And those are symptoms that trial counsel, all of them, observed in their own dealings with Mr. King. And the jury never heard that just months before this crime, Mr. King had discovered his mother's lifeless body in the shack where they lived and pointlessly sought to revive her by frantically adding more wood to the fire. The jury heard mental health testimony? Yes, Your Honor, they heard mental health testimony. All of the experts who testified that he had personality disorder, schizophrenia, drug history, started huffing gas several times a week between the ages of 9 and 12, heard voices that would tell him to kill himself. Your Honor, some of that I believe, Your Honor, is not from experts who testified, but from the central state hospital doctors who evaluated Mr. King after he had a psychotic break at the jail. Dr. Dickinson and Dr. Miller testified in support of the guilty but mentally retarded verdict, but some of those symptoms were not covered in their testimony. I don't believe either said that he had a personality disorder, but maybe I'm misremembering. But at any rate, a personality disorder is a far cry from a thought disorder. I testify to his diagnosis of King having a borderline intellectual handicap and a personality disorder of mixed type. Okay, I may be mistaken with respect to Dr. Miller, but again, a personality disorder is a far cry from a psychotic thought disorder such as schizophrenia. A far cry from hallucinations including pink elephants on the ceiling. Dr. Miller did not credit the pink elephants comment as a hallucination. In fact, found that as evidence of potential malingering on Mr. King's part. But the evidence that was available in trial counsel's possession, including from the jail psychiatrist who diagnosed Mr. King with schizophrenia, was never presented to the jury. Trial counsel was told by Mike Mears, who was the head of the Multicounty Public Defender's Office, that he needed to figure out why Mr. King was on these very powerful antipsychotic medications. Medications you wouldn't take for a personality disorder. Medications you would take for very serious tranquilizing type effects on you. And that's something that trial counsel never did, even though the records were in their possession. It left his experts, it left Mr. King's experts completely in the dark and allowed Prosecutor Johnson, who defense counsel knew to be a very aggressive prosecutor and knew to expect a malingering allegation from him, completely in the dark and gutted the entire guilty but mentally retarded defense as well as this defense strategy to show that Mr. King was a less culpable player in this murder. Your Honor, before you conclude, are precedents clear that Georgia's reasonable doubt standard to prove intellectual disability does not violate the Constitution? Your Honor, we would argue that this case presents the court its first opportunity without the restrictions of ed pediferance to review that claim de novo based on the procedural history of that claim in particular. I think the Rollerson decision really forecloses the argument that this isn't entitled to the deference. Because although that's another instance where the Georgia court referred to the earlier determination as res judicata but then went on to address the merits of it and concluded that it failed and that's exactly what happened here. Your Honor, I would disagree with that characterization because I think the Rollerson opinion, the state court opinion, made very clear that it was ruling alternatively in the merits and here we have a single passing reference to Atkins which we don't believe is sufficient to characterize as a decision on the merits. I'll reserve the remaining time for rebuttal. Okay, thank you. You've saved seven minutes. Ms. Grant. Thank you. I need some water here, sorry. Ms. Grant, one thing that you helped me with when you start is that I think the district court mistook the McTeer challenge as procedural default which is something you repeat in your brief and then address cause and prejudice but it appears to me, unless I'm missing something, that your opposing counsel is right that that's really something where there was a failure to exhaust it. I agree, they did not. I mean, I think first the district court said that they did not raise McTeer on direct appeal therefore the McTeer as to the challenge to McTeer is defaulted There's only a failure to exhaust which is different from default. I think it's both. I think it's unexhausted and procedurally defaulted because they did not raise it, yes. I think that we addressed it as procedurally defaulted just because that's usually how we first address those particular issues regarding jurors. But yes, it would be a failure to exhaust as well. Also, with regard to the ineffective assistance of counsel claim that would be used as the cause and prejudice to overcome the exhaustion and procedural default of that. I agree. I'd like to start off with talking about 2254 D1 regarding Batson and whether or not the Georgia Supreme Court's decision is entitled to deference. I think this court was very clear in the Lee v. Commissioner case where he said in great detail how you are to give deference under Batson to a state court's decision and in it you state that where they don't specifically mention relevant information that you are still to assume that there are implicit findings there. Now, and also this court very, you know, obviously detailed in great detail why McGehee was very different there because you had a juror who was struck where the prosecutor gave a race-based reason and the court explicitly did not look at it. They said we're looking at two other reasons but not that reason. And this court said that's not considering all relevant circumstances. Here you have nothing in the record showing that the Georgia Supreme Court or the trial court for that matter refused to consider anything that was in the record stripping this Georgia Supreme Court's decision of a DPA deference. I'd like to start off with talking a little bit about how the Batson hearing was conducted. I would disagree actually, Judge Wilson, because you would still be constrained by the fact findings of the court. I don't think that the fact findings would be stripped away. Even if you were looking at this particular issue on DeNovo Review you still have to give deference to the fact findings of the Georgia Supreme Court. That's how I read Batson and all of, you know, the progeny there. ...of all races during the war, Derek, about the roles they served in places of worship. Number one, that's not true, is it? Yes, that is actually true. I would take you back to the defense counsel's direct appeal brief. On direct appeal, they identified in there 16 individuals from the veneer that had been questioned and they had given their positions. James Orland and Robert Lynch were questioned about their religious views? Yes. So in those, well, they state in their brief that these people held these particular positions within their church. So they were questioned at some point. I can't tell you. I do apologize. I can't say if it's the defense or Mr. Johnson. But we do know that they were questioned. I'm not aware of anything in petitioner's briefs or anywhere else stating that the Georgia Supreme Court made an unreasonable fact finding. Let me ask you this. If we go to the record, will the record reflect that Mr. Johnson asked them about their religious views? I don't know about that. All I know is that they brought this up in their direct appeal brief and I put it in my chart here. And then the rest of the sentence in the Georgia Supreme Court's opinion says, and that none of the other prospective jurors were ministers. Factors that support the state's contention that its explanation is not contextual. And we do know that Thomas Lightsey was a church minister. James Orland was a church deacon and chaired a board of deacons. Aubrey Lynch was a church deacon and Rebecca Griffin was a church training union instructor. But none of those were ministers. The only person there, Lightsey, he was a minister. And Mr. Johnson did not ask him that. Defense counsel did ask him that. But again, they did not get to him. The Georgia Supreme Court said none of the prospective jurors. So it doesn't really matter whether or not he was a evangelist. He was a prospective juror. And he was a church minister. Correct. I agree. I don't understand how the striking takes place. That's what I was going to go to. So in the striking you have, I thought there were 54 members but maybe I transposed the numbers there. So first they do the striking and the prosecutor gets 10 strikes. And the defense gets 20 strikes. And that's how they do the striking. Did the prosecution use all 10 of them? He used all 10 strikes. The defense, I thought the defense used all 20 of their strikes. I thought they used all 20 of their strikes. When finished, what you were left with was what? What you were left with were, you had, I wrote this down. You had 2, you had 5 females, 7 males, 2 African Americans, and 10 white. But when the state finishes with its 10th strike, where are they in the lineup? I don't know, I'd have to look that up your honor. But I think there's another explanation there regarding Mr. Lightsey. I agree Foster does say you have 10 strikes, which is half of what the defense says. So you need to know probably ahead of time who it is you want to strike from your jury. You know that it's very unlikely that you'll probably get to Mr. Lightsey. And you have here, well I know I have this one minister. I know I'm going to get to that juror. And you have all these other jurors. So what you're saying is that he weighed all these other jurors' reasons more important than he did in the end whether or not he would get to Mr. Lightsey and use his strike to strike him as a minister. Don't know that it's necessarily that he didn't strike, you know, showing that he didn't strike or he didn't have the opportunity to strike. It's whatever his mindset was there, hey it doesn't mean that he has to strike the minister. It has to be that he chose not to strike all the other ministers. It would be a different record if the prosecutor had been able to reach Lightsey and not exercise to strike. Correct. Given that all those facts are in the Supreme Court's decision, are you asking us essentially to do our own de novo review or is taking note of those facts part of our epidefference? I think taking note of the facts are part of your epidefference because what you're looking for here is whether or not there's any permissible view for the Georgia Supreme Court's fact finding. So when you're weighing it out, you're looking at this third step and you're looking at everything that's happened here. You have Ms. Burkett, you have the prosecutor who said I struck her because she was a minister and because she knew the defendant's family. We know that there were no other jurors that came along that they could have struck that were ministers. So there really aren't any similarly situated jurors who were not struck there that they could get to. Regarding her knowledge of the actual defendant and his family, when you look at the similarly situated jurors, they didn't know them the same way that Ms. Burkett did. And on direct appeal, they raised it who knew defendant Van, Griffin, Vaughn, and Edwards. And here the similarly situated jurors they talk about are Vaughn who was just a lunchroom lady where Mr. King was in school. She didn't really know him. She was just a lunchroom lady. Then you had Griffin who went to school with his sister and her brother may have gone to school with his brother. And that's it. And then the last one, Edwards who said he may have taught King in school because he taught everybody but he taught 700 kids a year. So that's the only, as far as Milton and Arnold, those weren't raised on direct appeal and we stand by our statement. What about Burkett's connections? Burkett's connections, just that she knew the family. It doesn't say that she knew them in depth. I think she was from that, actually I have her testimony. Right here, sorry. I don't want to misspeak. Okay, so it says here on, this is doc 1622 at page 70. She says she stays in Serence. She lives in Serence. She says I know, she knew the victim's family who went to school with some of her younger sisters. And she says, do you know Mr. King? He says I know his family. And that is that question. Am I looking at the right? Yes. I've labeled everything here just making sure. So that was the colloquy between the judge and That was the colloquy between the judge and Ms. Burkett. And then Mr. Johnson just asked her what her position in the church was. He didn't ask her how well she knew the family or not. So, my opinion is this record looks a lot like what Mr. Johnson used. Seven of his ten serenity challenges exclude blacks from the jury. Correct. And he had ten and then he used three to exclude women. Is that right? Correct. And so, one black served in the jury. Two blacks served actually, Judge Wilson. One that tried to strike himself. The one that served, he didn't have any record of strikes left when he went around to that juror. Isn't that right? I don't know that. That's true, Your Honor. It may be. I just don't know that that's true. What was the order of the strike? He used all of his strikes first. That's the way I understood it. He does. I don't know that he actually didn't. I think he didn't use a strike on one of the African Americans. I don't know that he didn't necessarily reach it, but I would have to look back at the record. I do not know that that's true or not, Judge Wilson. I can't say that. Yes. Yes. Yes. I'm not saying that. Again, going back to the Georgia Supreme Court's analysis here on the third prong, like, you know, as Judge Grant asked, you know, are you doing de novo review or are you finding your own facts? I think, no, what you're saying is, does the record as a whole find any permissible review for the fact finding of the Georgia Supreme Court? And here, you can say that it does. Because we know that she was a minister, so that's obviously in the record. He did do that. I mean, that is supported by the record. She does say she does know the defendant's family. Again, not to what degree, but she does say that. So that is also supported by the record. But also, like all the other cases where they found facts and challenges, you don't have evidence from his notes. And in this case, you had the State Habeas Court and the Federal Habeas Court who did an in-camera inspection of his voir dire notes, and they were specifically pointed to those notes for this challenge. And they didn't find anything. You don't have, you know, for example, like in Millerell, where you have racial history there, history of racial discrimination in Batson, you don't have any of that. What you have is that one juror who he tried to strike, the judge said, I find that your reasons aren't supported by the record. That doesn't demonstrate a hostility to Batson. You know, I have to tell you, I've been around a long time, and I have never seen a quality between a judge and a lawyer of this magnitude before, without repercussions, to the point that the judge had to tell him to calm down. And haven't we said, and the Supreme Court has said numerous times before, including Flowers v. Mississippi, that the demeanor of the prosecutor is a relevant consideration? Has it been taken into consideration? I agree it is a relevant consideration. And the trial judge was in the best place to determine what that relevant consideration is. He saw his demeanor. He chose to find that his reasons were not discriminatory. The trial judge did, but the Georgia Supreme Court didn't say anything about the prosecutor's demeanor. But the Georgia Supreme Court did not also say that they did not consider it. And I think that it would be then an implicit finding under this Court's decision in Lee v. the Commissioner. And again, I go back to, it is a way. I mean, you're looking at everything. Regarding Juror Alderman, I understand what Ms. Juror Alderman specifically said that I shudder because she's a black woman from Sarasota County. I don't understand how he changed his mind. And the Georgia Supreme Court didn't say anything about that. That's not exactly how that went, actually, Judge Wilson. When you look at it, first, Mr. Johnson gave his reasons. And when he would give his reasons, he would say what the race and what the sex was. He would say black female, white female. He would say that at the beginning so that the judge would understand. He didn't track his notes. Yes. It's almost like, if you go and look at his notes, which are in the record, and the transcript of what he says when he's asked to explain each jurors and his strike, it's as if he's reading from the notes. Correct. In exactly the order of his notes. Did he or did he not say that I'm striking Ms. Alderman because she is a black woman from Surrency County? This is what he said. He said, when he first started doing his strikes, he said, this is a black female. And then he gave his reasons that she knew the defendant, she was from Surrency. Then the judge said, the trial court said, And then the trial court said, I need some explanation. And Mr. Johnson goes back and he says, the main reason, she's a black female from Surrency. I took the black female to be him stating again that she's a black female. Now, that's my view. And then he gives his reason. And then he demonstrated a hostility to Mets. Correct. I understand what you're saying there. But then when it came time for Mr. Jackson to give his response to Mr. Johnson's statement regarding Alderman, he said she was a black female from Surrency and that she knew the defendant and I don't think these are legitimate reasons. And Mr. Johnson responded again and he said, you're saying that I said that she was a black female, but I'm telling you it's because she knew the defendant. And then the trial court, he didn't change his reason. No, he didn't. He explained his reason as the same reason that it was because she knew the defendant, which is what he'd said before the main reason was. If we have to defer to the trial court on the other determinations, why wouldn't we also defer to the trial court's apparent conclusion that he struck Ms. Alderman for an inappropriate reason? And I was about to get to that. So when the trial court goes to look at Alderman, he reserves judgment on Alderman. And he says, all right, let me listen to Alderman's voir dire again. He listens to Alderman's voir dire and he comes back and he says, actually, Mr. Johnson had given two reasons. He said she knew the defendant's family and our state is investigating her husband for theft. And the trial judge said, I find that the record does not show that she really knows the defendant's family that well. And on the second reason, I find that you haven't put forth any proof that the state is investigating her husband for theft. Therefore, I am receiving the sure, I find, discrimination. The court never said, I am finding that you said you struck her because she's a black female. And also importantly, on direct appeal, Mr. Jackson did not, the defense counsel did not make this argument that Mr. Johnson referred to her as a black female and that's why he was striking her. He didn't make that argument. So, you know, all these people... What you're telling me is discredited as proffered. Correct. For two mutual reasons. Correct. There were two jurors. And they didn't see the juror. Correct. But I do agree that you're saying that you do find discrimination. The railing, we'll call it railing against Batson. Where does that occur? Is that in reaction to the seating of aldermen? Or is it somewhere else? Well, there are two that my opposing counsel referenced. The first one is after the prima facie case. So, when he says, you know, hey, I mean, Mr. Jackson says, you know, this is the number that has been struck. I think I've shown a prima facie case here. Then Mr. Johnson, who is very theatrical, said, you know, I disagree with having... I don't think you've shown your prima facie case. And, you know, he didn't like that Batson put race like that on the table. And then after the judge said, I am reseating aldermen, that is again when he got upset. And the judge told him he had to calm himself down. But I didn't... When you're looking at everything that he said there, I don't take anything... Like, for example, when you're looking at Foster, or you're looking at Batson, or you're looking at Percat, or McGahee, or any of these Miller-El, I mean, you have definite statements of discrimination, history of discrimination, notes, things of that nature. Here you just have a prosecutor not saying that he wants to be able to strike people because they're African-American or because they're female, but just disagreeing with the way that the United States Supreme Court says we have to look at it. That's the concern that I have with these cases that you mentioned. We have said, and McGahee, and the Supreme Court said in Flowers v. Mississippi, that the last state, recent state court decision has to take into consideration these relevant circumstances, and these relevant circumstances are missing from the court opinion. I don't think that they're necessarily missing from the court. They're just not stated, and this court said in Lee v. Kunishner, you don't have to state them. It's implicit that you have considered them. The defense counsel argued them. Why can't you say that in any case? I think you can say that. I think you can say that. Well, in Lee it says you look at it and you say, is there any permissible way for the state court to have made that fact-finding? And that's what I'm trying to ineloquently say here, is that when you're looking at the fact-finding, I understand you have things on one side and things on the other side. On the one side, you have Mr. Johnson making this rail against Batson. On the other side, you do have him giving race-neutral reasons, and you don't have similarly situated white jurors. You also have the trial court making that. I don't really think that he gave race-neutral reasons. That's at step two of Batson. But this case is all about step three at Batson, and whether or not the trial judge, if we conduct an overview, or even with evidence, that the trial court abuses discretion with regard to the use of these correctory strikes. I agree. And the race-neutral reason has to be supported by the record, and that's what Foster says, and here the record supports it. This is all about step three at Batson, right? Correct. But step three involves looking at whether or not the record supports the race-neutral reasons, and the race-neutral reasons have been supported in the record here. It's just such a strong point that he had ten preemptory challenges, and he used, what, seven against black and three against women. No, actually, it's not. It's seven against black women. Three against white women. Okay, so he used all ten of his preemptory challenges on white women and seven blacks. Three white women and seven black males and females. Only females. Okay. I'm sorry? All ten of the strikes were women, is what you're saying. Yes, yes. Seven of them were black women, and three of them were white women. Correct. Let me ask you about Janie Ford. Is she a struggler because she's a single mom and there was a burden on her to serve? Yes, Ms. Ford testified that she was a single mother, and I understand her kids are 20 and 17. They live with her. She said it would be a struggle for her because she was a single mother, and she supported them, and she would be out of work, and it would be a financial burden for her. That's what she actually stated during Bordier. But the other reason was that she stated that she enjoyed working with intellectually disabled students, and because intellectual disability was an issue in the case, that was the second reason that he struck her as well. This record also reflects that there were white jurors who had exposure to mentally ill persons, but the prosecutor didn't have any problems with this. And he explained that, and he said none of them stated that they enjoyed working with intellectually disabled students. His was because she enjoyed that relationship. He was very clear about that, and there were no similarly situated jurors on that front. So, again... At least just speaking for myself, the concern that I have is, you know, we're able to explain everything away, but when you take all of these facts into consideration, it appears to me this is a pretty strong balance to claim on Mr. King's part. When you matter everything, you take everything into consideration, which is what the Supreme Court says we're required to do. I don't disagree that you have to take everything into consideration. I'm just saying that when I look at the balance here, and I look at the Supreme Court precedent on Batson, you have here that the prosecutor has given race-neutral reasons that are supported by the record. There aren't similarly situated white jurors. There's no history of racial discrimination. There are no notes showing that he's discriminated. I'm sorry. So, you say that we have to take everything into consideration. I want to make sure I understand, though. I thought that the Batson analysis is a juror-specific analysis. And so what we have to make is a determination, juror by juror, that the overruling of the Batson objection for those who were seated on the... involved either or both of a decision that was an unreasonable or contrary to application of clearly established federal law and or unreasonable determination of fact. Yes. It's not we just look at Batson overall for everything. It's juror-specific. I thought the case was. That's how I understand it, Judge Pryor. And that's why I'm saying on each particular juror, I'm trying to show you what the balance there would be on. I'm looking at, obviously, D-2 right here. But I would say that the argument for D-1 is the same for all of them. You know, whether or not the court looked at all the relevant circumstances there. So, yes, I agree. I would like to go on to the... I'm going to go on, but I do have a question. In terms of if you look at how the Supreme Court looked at it in Flowers, does that mean that you import all of these global reasons into the specific consideration for each juror? Or how do you look at the overall circumstances when you do the juror-by-juror evaluation? I don't think there are any global circumstances here that haven't been argued to the Georgia Supreme Court or any new issues that you're going to be looking at that they weren't looking at. I think you're just saying whether or not looking at that issue, it was permissible for them to come to this factual decision. We look at the record and what the state court did in each case overruled the Batson objection. Correct. I thought, if we're giving a deep indifference, which I think we did, then we give the benefit of the doubt to the ruling and see if the record can fairly support that, even if we disagreed with it. Correct. Correct. Which is essentially what the district court said when she was looking at McCall. Let me just ask you this. I'm going to read you the last few sentences from the Supreme Court's opinion in Flowers v. Mississippi. The Supreme Court said that we need not and do not decide that any one of these four factors alone would require reversal. All that we need to decide, and all that we do decide, is that all of the relevant facts and circumstances taken together establish that the trial in Woodlawn, our sixth trial, committed clear error in concluding that the state's peripterous strike of Black, Hispanic, and Jew-American, Carolina-invited was not motivated in substantial part to non-discriminatory intent. I mean, what that suggests to me is that we are required to take into consideration the totality of the facts and circumstances and not evaluate whether or not there's a VATS in violation with each individual juror that the state exercised its peripterous strike against. I don't take... I disagree with your reading there. I take it as they're saying it's specific to each particular juror. That's my interpretation of what you just read. Can I just ask you about the intellectual disability? Sure. Yes. On the intellectual disability, the burden of proof, when you... I had to go back and I looked at all the briefs and everything that were filed. In the Georgia Supreme Court, they specifically challenged that standard under the 8th Amendment and the 14th Amendment. When they got to the state habeas court and they briefed that issue to the court, they said specifically this issue was decided by the Georgia Supreme Court. You already have a decision here. And they said, but we think you should reconsider it under Atkins. The state habeas court said, all right, I recognize that there's already been a decision on this by the Georgia Supreme Court. You've asked me to look at it under Atkins. I look at it under Atkins. I see Atkins says here that we're going to leave these procedures to the state. So I find that the Georgia Supreme Court's decision still stands. When they get to the district court, when they file their final merits brief, they tell the district court, hey, this decision has already been made by the Georgia Supreme Court. The Georgia Supreme Court decided this. They denied it on direct appeal. They never once say that there is not a merits decision while they're in the district court. The first time they ever state that there is not a merits decision is when they filed their expansion for COA with this court. So when the district court decided it, it said, no, there's a merits decision. Everybody had already agreed there's a merits decision, and I am bound by this court's decision in Rollerson. Has any capital defendant in Georgia ever been treated with intellectual disability beyond a reasonable doubt? Yes. Yes, Judge Wilson. And that issue came up in Young versus the state. Can you cite us a case? I can't cite you a case, but I can certainly look that up and brief the court on that. Has any capital defendant treated with intellectual disability beyond a reasonable doubt in Georgia? Or a jury found? I will look that up. A defendant was ineligible for a death sentence because of mental retardation. I think there is one. But again, I will look that up because the issue just came up, like I said, in Young versus the state before the Georgia Supreme Court, and that was an issue there. I'm pretty sure there is. However, going back to, like I stated, they presented this, and they have said up until their expansion that they had presented this particular claim and it had been decided by the Georgia Supreme Court. I see that my time is up, and I would just ask that this court affirm the denial of relief by the district court. Thank you. I have one follow-up question. Sure. If there are two ways to read the Georgia Supreme Court's decision, one is addressing it and one is not, are we obliged to adopt who's reading of whether the decision by the Georgia Supreme Court addressed that issue? I'm sorry. I didn't understand. I'm sorry. I guess one question is, can you tell me what the Georgia Supreme Court said about this issue on the merits? Oh, about the burden of proof? I'm sorry. The Georgia Supreme Court, it was just one line, and they said that we find that Georgia's burden of proof, and they list the statute, is not unconstitutional. They don't say specifically, you know, they don't go into any sort of analysis of it. No. Okay. Thank you. Thank you. Thank you, Your Honor. I thought it might be helpful to describe the voir dire process in a little more detail because I think there's some confusion in the room. There were, again, 42 people on the panel the starting point for the strikes for each side. The prosecutor has the first strike or the first opportunity to strike or accept the juror, and if the prosecutor strikes the juror, then the defense would have an opportunity to accept or strike that juror. If neither party strikes the juror, then that person would be seated as the juror. So the prosecutor does exercise all 10 before the defense exercises any. Correct. And the defense did not exercise all 20 of its front row strikes. It only exercised 17 of the 20, and that is why Mr. Lightsey wasn't reached. But otherwise, in a typical case when the defense is exercising all 20 strikes, Mr. Lightsey and every juror in the panel would have been reached. The strike sheet for the... But the prosecutor had already struck all 10. Pardon me? So the prosecutor had already used all 10 strikes. He was out of strikes by that time. So again, he had to make that decision ahead of time. If he had reached Lightsey, it could very well be that the prosecutor still would have already exercised all 10, right? Correct, but he's making a judgment call in that exercise of the 10 that some other juror is more important for him to strike than Mr. Lightsey. And I'll point the court to the reason I'm not sure I understood what you said a moment ago, which is the only reason Lightsey wasn't reached was because the defense lawyer had not exercised all his strikes. That's not true, is it? I mean, it could be that the prosecutor still would have exercised all his strikes even if the defense lawyer exercised all his. That's correct, Your Honor. But had Mr. Lightsey been reached by either party, then even if the prosecutor had exhausted all 10 of his strikes, then that would have been considered an acceptance by the state. And that's certainly how the Supreme Court in the Foster decision talked about the jurors at the bottom of the panel there. And specifically, there's testimony quoted that because of the nature of the Varder process in Georgia, the state had to pretty well select the 10 specific people it intended to strike in advance because, like Your Honor is saying, they may be out of it by the time they would get it. When Mr. Johnson explained why he struck Ms. Burkett, he made very clear that he never takes ministers. And if this was such an important consideration for him, then he sure would have saved one of those strikes for Mr. Lightsey. And to Judge Wilson, your questions about the Georgia Supreme Court's opinion, I really would urge the Court to read the Varder of Thomas Lightsey when Prosecutor Johnson does not ask him a single question even though he had raised his hand as holding a leadership position in the church. And the Georgia Supreme Court's finding that the state consistently questioned male and female jurors of all races about their roles on the church is factually wrong with respect to Mr. Lightsey himself. I'd also like to point out with respect to Ms. Burkett that she was a housewife. She was a stay-at-home mom. She had three young children. And she also served as a minister in her church. And I think that's important just in terms of what her responsibilities at the church would have been. Again, we don't know because Mr. Johnson didn't ask any details about the roles and responsibilities of Ms. Burkett, Mr. Lightsey, or the deacons who served on the jury. And with respect to her familiarity with Mr. King's family, again, Juror Rebecca Griffin, a white woman who served on the jury, also had familiarity with Mr. King's family. Both she and her sibling had gone to school with Mr. King's sister, and I believe Mr. King himself, and that was never proved by the prosecution. And I think it's important that just with respect to your question, Chief Judge Pryor, about how is this court to look at the jurors? Is it on an individual basis? The Supreme Court has made very clear that the court has to consider all the relevant circumstances. And so with any, even with Flowers, or these other... But the issue of racial discrimination is juror specific, right? The court would have to find a violation with respect to an individual juror, at least one. But that doesn't mean that the court is to look in isolation. We will say, for example, well, there's just enough smoke here that I think there was racial discrimination somewhere. Correct. That's correct, Your Honor. I don't think that's... Correct. I don't think that's the position the state was urging, though, and especially as it briefed this issue, where as long as you look at the issue on its own, the court could say, yes, this was a race-neutral reason, but that is not what the Supreme Court tells courts to do. And I'd like to just point to four specific mistakes that Prosecutor Johnson, so-called mistakes that Prosecutor Johnson made. First, with respect to Ms. Alderman, he said he struck her because she knew Mr. King, and she didn't. With respect to Juror McCall, he said he struck her because he testified that after her husband testified that she was opposed to the death penalty. That was not true. With respect to Juror McTeer, which again, this court may not be willing to expand the COA to consider Ms. McTeer, but certainly his mistakes with respect to her can be considered and should be considered under all the relevant circumstances. He similarly made a mistake. And with respect to Juror Jane Ford, Johnson said he struck her because she was a single mom with no one to watch her young children. That was not, in fact, the reason, that was not supported by the record, but yet the Georgia Supreme Court adopted a totally different reason, which was supported by the record, but was not the one that Johnson gave specifically, that she would have a financial hardship to serve on the jury, which was not something that was unique to her. And with all of this evidence, the strike pattern that was never mentioned by the Georgia Supreme Court, which happenstance is unlikely to explain, and the numerous other relevant circumstances that the Georgia Supreme Court did not consider in its thoughts and analysis, we would urge this court to grant habeas release for Mr. King. Thank you. Thank you for your questions. We are adjourned. Thank you. All rise.